1  WO

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9  St. Paul Fire & Marine Ins. Co.,        )        CV 10-00527-TUC-JGZ
                                           )
10             Plaintiff,                   )        **ORDER**
                                           )
11  vs.                                     )
                                           )
12                                          )
   Nat'l Union Fire Ins. Co. of Pittsburgh, )
13  et al.,                                 )
                                           )
14             Defendants.                  )
                                           )
15  _____ )

16

17         Pending before the Court are cross-motions for summary judgment filed by Plaintiff

18  St. Paul Fire & Marine Insurance Company ("St. Paul") and Defendant National Union Fire

19  Insurance Company of Pittsburgh ("National Union").  (Docs. 113, 84.)  Both motions are

20  fully briefed.  (Docs. 101, 102, 116, 109 and 115.)

21         Also pending before the Court is a Motion for Modification of the Scheduling Order

22  and for Leave to File a Second Amended Answer and Counterclaim filed by National Union

23  and Defendants American Home Assurance Company ("American Home") and Insurance

24  Company of the State of Pennsylvania ("ISP").  (Doc. 69.)  That motion is also fully briefed.

25  (Docs. 80, 87.)

26         Also pending before the Court is Plaintiff's Motion for Leave to File Sur-Reply, filed

27  in relation to Defendants' reply to Plaintiff's opposition to Defendants' Motion for

28  Modification.  (Doc. 88.)  Defendants opposed Plaintiff's Motion.  (Doc. 89.)

**Factual and Procedural Background**

**Overview**

This case involves a dispute between two insurance companies regarding coverage for a car accident case litigated as *Peralta v. Muratore, et al.*, Pima County Superior Court Case No. C20075578 ("the *Peralta* litigation"). St. Paul provided relevant insurance coverage to a corporation initially known as Wireless Facilities, Inc. ("WFI") which eventually changed its name to Kratos Defense & Security Solutions, Inc. ("Kratos").[1] (Doc. 84-2, ¶ 1; Doc. 98, pg. 7; Doc. 85-1, pgs. 2-20.) National Union provided relevant insurance coverage to a venture capital enterprise known as Burgundy Acquisition Corp. ("Burgundy"), which eventually changed its name to WFI. (Doc. 85-1, pg. 56-96.) At the time of the accident that gave rise to the *Peralta* litigation, WFI and Burgundy were in the midst of a business acquisition deal designed to transfer WFI's commercial wireless division to Burgundy. On August 20, 2007, an employee working on a commercial wireless project pursuant to an employee lease agreement between WFI and Burgundy caused a serious vehicular accident while on the job. Following the accident, various disputes arose regarding who the employee was working for at the time of the accident and which insurance policy would provide coverage.

**The Policies**

St. Paul issued an Automobile Liability insurance policy ("the St. Paul Auto Policy") to WFI effective June 1, 2007 to June 1, 2008. (Doc. 84-2, ¶ 1; Doc. 98, pg. 7; Doc. 85-1, pgs. 2-20.) The St. Paul Auto Policy has a $1,000,000 limit. (Doc. 85-1, pgs. 5, 12.) St. Paul also issued an Umbrella Excess Liability Protection insurance policy to WFI effective

---

[1] In an attempt to distinguish between the various parties involved in the underlying litigation, the Court refers to the company that began as WFI and later became Kratos as follows: if the reference is related to a date before September 12, 2007, the Court uses "WFI." If the reference is related to a date after September 12, 2007, the Court uses "Kratos." The record demonstrates that WFI changed its name to Kratos with respect to the St. Paul insurance policies on that date. (Doc. 85-1, pg. 53.) The Court has declined to consider the various WFI Delaware corporate filings submitted by National Union, as those documents are not relevant to the present action. The Court refers to Burgundy Acquisition Corp. as "Burgundy" throughout this opinion, despite the fact that it appears that Burgundy eventually changed its name to WFI. (Doc. 85-1, pg. 65.)

June 1, 2007 ("St. Paul Umbrella Policy"). (Doc. 85-1, pgs. 21 - 48.) The Umbrella Policy has a $25,000,000 limit. (Doc. 85-1, pg. 21.) On September 26, 2007, St. Paul processed a "Policy Change Endorsement" for the St. Paul Auto Policy and the St. Paul Umbrella Policy effective September 12, 2007. (Doc. 85-1, pg. 53.) The Endorsement states that WFI's name is changed to "Kratos Defense & Security Solutions, Inc." (Doc. 85-1, pg. 53.)

On August 29, 2007, National Union issued a Business Auto Insurance Policy to Burgundy effective July 24, 2007 to October 1, 2008 ("National Union Auto Policy"). (Doc. 85-1, pg. 56-96.) The National Union Auto Policy has a policy limit of $1,000,000. (Doc. 85-1, pg. 57.) On November 13, 2007, the National Union Auto Policy was amended to change the policy holder's name to Wireless Facilities, Inc. (Doc. 85-1, pg. 65.) National Union also issued a Commercial Umbrella Liability Policy to Platinum Equity, LLC (National Union Umbrella Policy"). (Doc. 85-2, pg. 2.) The National Union Umbrella Policy was modified by a series of endorsements, some of which list Burgundy as an insured. The National Union Umbrella Policy has a policy limit of $50,000,000.

**The Asset Purchase Agreement**

On July 7, 2007, WFI and Burgundy entered into an Asset Purchase Agreement ("APA"). (Doc. 85-2, pgs. 61-144.)[2] Pursuant to the terms of the APA, WFI agreed to sell to Burgundy the business segment of WFI that provided various services to the non-governmental wireless communications industry. (*Id.* at 73.) The APA states that Burgundy

---

[2] St. Paul objects to the admission of the APA into evidence on the ground that National Union has failed to properly authenticate or lay foundation for the document. National Union attached the APA as an exhibit to its Statement of Facts supported by the declaration of attorney Brandon Howerton, counsel for National Union. Mr. Howerton avows that the APA attached to National Union's statement of facts is a true and correct copy of the APA produced by St. Paul during the course of this litigation. The Court concludes that the APA submitted to the court is sufficient to support a finding that the item is what the proponent claims it is pursuant to Rule 901(a), Fed. R. Evid. In addition, Rule 56(c)(2) permits objection to a fact not supported by admissible evidence only if the "material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." St. Paul has not met this requirement. Moreover, St. Paul appears to merely challenge the manner in which National Union has submitted a copy of the APA, without making any allegation that the copy submitted to the Court is not an accurate representation of the APA. The Court similarly rejects St. Paul's contention that the APA constitutes inadmissible hearsay; it is admissible pursuant to Rule 807, Fed. R. Evid. The Court will admit the APA into evidence for purposes of these Motions.

will acquire WFI's assets at "Closing," including assets used primarily in the conduct of the business, all vehicles owned or leased by WFI and used directly in the conduct of the business and the name WFI. (*Id*. at 84.) The listed closing date on the APA is July 24, 2007. (*Id*. at 61.)

Under Section 6.5 of the APA, Burgundy agreed to lease certain employees from WFI for a period of time commencing on the closing date and ending either sixty days later or at the end of the month in which that sixty-day term expired, whichever came later ("the Transition Period"). (*Id*. at 105-106.) Leased employees would be offered employment by Burgundy on an "at-will" basis on the first day following the end of the leasing period, at which time they would become "transferred employees." (*Id*. at 106.) The APA provides that WFI will retain, and Burgundy will not assume, "any employer or employment-related obligations or Liabilities to the Transferred Employees arising before the date they become Transferred Employees." (*Id*. at 106.)

Section 10.1 of the APA states that WFI will indemnify Burgundy for any and all damages arising out of or relating to "any Excluded Assets or Excluded Liabilities." (*Id*. at 120.) Burgundy "will indemnify and hold harmless Seller Indemnified Parties from ... any and all Damages to the extent arising out of or relating to ... the operation of the Business by [Burgundy] after the Closing Date, excluding ... the Excluded Liabilities or the Retained Assets." (*Id*.).

**The Transition Services Agreement**

The APA also provides that WFI and Burgundy will enter into a Transition Services Agreement ("TSA") concurrent with the execution of the Asset Purchase Agreement. (Doc. 85-2, pg. 73.)[3] On July 24, 2007, Burgundy and WFI executed a TSA stating that Burgundy had "agreed to purchase from [WFI] and WFI had agreed to sell ...all of the Transferred Assets against delivery of the Closing Purchase Price." (Doc. 85-3, pg. 2.)

---

[3] For the reasons stated in footnote 2, the Court rejects St. Paul's objections to admission of the TSA.

1     Schedule A of the TSA provides that WFI will offer various human resources and

2   benefits management services to Burgundy during the Transition Period.  (Doc. 85-3, pgs.

3   15-17.)  The TSA provides that, while WFI managed the payroll for the leased employees,

4   Burgundy would reimburse WFI for the leased employees' wages and taxes.  (Doc. 85-3, pg.

5   19.)  The TSA states that WFI "shall relinquish day-to-day operational control of the Leased

6   Employees to [Burgundy] and [Burgundy] shall be solely responsible for the Leased

7   Employees' activities and performance, including but not limited to providing the appropriate

8   supervision for such Leased Employees."  (Doc. 85-3, pg. 18.)

9   **Stacy Rothwell Muratore**

10    Stacy Rothwell Muratore ("Muratore") was a leased employee pursuant to the APA.

11  (*Id.* at 135.)  On July 26, 2007, Burgundy sent a letter to Muratore offering her employment

12  with Burgundy effective October 1, 2007.  (Doc. 85-5, pg. 67.)[4]  Muratore signed the letter

13  on July 30, 2007.  (Doc. 85-5, pg. 71.)

14    On August 20, 2007, Muratore was working as a zoning manager for a Sprint/Nextel

15  New Site Build Project. (Doc. 85-5, pg. 3.)  The Project Manager for the Sprint/Nextel

16  Project described the Project as "designed and implemented by Kratos, f/k/a WFI."  (*Id.* at

17  2-3.)  The Project Manager was also a leased employee pursuant to the APA.  (*Id.* at 4, 8.)

18   The Project Manager authorized Muratore to rent a vehicle from Enterprise Rent-A-Car

19  using WFI's corporate account ("the Rental Vehicle").

20    Documents submitted by National Union establish that WFI entered into a Corporate

21  Class Preferred Rate Agreement with Enterprise Rent-A-Car on December 6, 2005 and that

22  Muratore rented the Rental Vehicle using WFI's account number with Enterprise on August

23  7, 2007 with an anticipated return date of September 4, 2007.  (Doc. 85-4, pgs. 38-39, 50.)[5]

24

25

26    [4] For the reasons stated in footnote 2, the Court rejects St. Paul's objections to admission
    of the letter from Burgundy to Muratore.

27

28    [5] For the reasons stated in footnote 2, the Court rejects St. Paul's objections to admission
    of the Enterprise Rent-A-Car documents.

Julie Bell, Deputy General Counsel for Kratos, testified that WFI did not instruct Muratore to undertake the trip or to rent the vehicle in which she was traveling at the time of the accident.[6]  (Doc. 83-6, pgs. 91-96.)

While driving the Rental Vehicle on August 20, 2007, Muratore caused a collision which seriously injured Mercedes Garcia Peralta.

**The *Peralta* Litigation**

On September 26, 2007, Mercedes Garcia Peralta and Roberto Peralta ("Peralta") filed a complaint against Muratore in the Superior Court for the State of Arizona, Pima County, alleging that Muratore was liable for the August 20, 2007 collision.  (Doc. 109-1, pg. 74.)[7] The complaint further alleged that undesignated corporations and/or partnerships were vicariously liable for Muratore's actions under the doctrine of *respondeat superior*.

On November 16, 2007, the law firm of Lewis Brisbois Brisgaard and Smith ("LBBS") filed an Answer on behalf of Muratore, stating that at the time of the accident Muratore was conducting an errand related to her duties as an employee of WFI.  (Doc. 85-4, pg. 12.)  On December 14, 2007, LBBS filed an Amended Answer on behalf of "Muratore, WFI and Burgundy."  (Doc. 85-4, pg. 16.)  The Amended Answer states: "WFI and Burgundy admit they are liable for the conduct of Defendant Stacy Muratore under the doctrine of respondeat superior." (Doc. 109-1, pg. 79.)  On January 26, 2009, Peralta filed a First Amended Complaint against "Muratore, WFI and Burgundy," alleging that Muratore was liable for the accident and "WFI and Burgundy" were vicariously liable for Muratore's conduct.  (Doc. 109, pg. 79.)

On June 15, 2009, "Defendant Kratos Defense & Security Solutions, Inc. f/k/a Wireless Facilities, Inc." filed an Amended Answer through separate counsel (not LBBS)

---

[6] National Union objects on the ground that Julie Bell lacks personal knowledge of this fact.  In light of the Project Manager's undisputed testimony that he authorized Muratore to rent a vehicle from Enterprise Rent-A-Car using WFI's corporate account, Ms. Bell's denial of WFI's authorization is unnecessary to disposition of the issues raised in this litigation.

[7] Pursuant to Rule 201, Fed. R. Evid., the Court takes judicial notice of the state court records in the *Peralta* case.

1  denying that Muratore was acting as an employee of Kratos/WFI at the time of the accident
2  and asserting that Muratore was acting within the course and scope of her employment with
3  Burgundy.[8] (Doc. 85-4, pg. 28.)  On June 29, 2009, Burgundy moved for leave to amend its
4  Answer in order to deny vicarious liability for Muratore and assert cross claims for
5  indemnification and contribution against Kratos.  (Doc. 85-5, pg. 52.)  In an order dated
6  September 15, 2009, the trial court denied Burgundy's motion for leave to amend.  (Doc. 85-
7  5, pgs. 50-54.)  The trial court found that the proposed amendment regarding vicarious
8  liability was requested too late and would be futile in light of the terms of the "leasing
9  agreement" between WFI and Burgundy.  (*Id*. at 53.)  The trial court also rejected
10 Burgundy's efforts to include a cross-claim against Kratos on the ground that Burgundy's
11 cross-claims did not arise out of the same transaction as Peralta's claims.  (*Id*. at 54.)  The
12 trial court noted that "there is nothing barring Burgundy from bringing suit against Kratos
13 in a different tribunal or forum in order to enforce such claims."  (*Id*. at 54.)

14         On October 13, 2009, the trial court granted a motion for summary judgment filed by
15 Kratos and a partial motion for summary judgment filed by Plaintiffs against Burgundy and
16 Muratore.  (Doc. 85-5, pgs. 22-26.)  Muratore conceded her liability for the accident and the
17 trial court entered partial summary judgment on the issue of liability against Muratore
18 without objection.  The trial court found that Burgundy had consistently, throughout the
19 litigation, affirmed its vicarious liability for Muratore such that Peralta was entitled to partial
20 summary judgment on the issue of liability against Burgundy under a liability theory of
21 *respondeat superior*.  (*Id*. at 23-24.)  The trial court agreed with Kratos' contention that,
22 based on common law, vicarious liability and lent employee principles, Muratore was
23 performing work for Burgundy at the time of the accident and Kratos was not liable for her
24 conduct.  (*Id*. at 24-25.)  Accordingly, the trial court granted Kratos' motion for summary
25 judgment on all claims.  (*Id*. at 25.)

26

27       [8] According to the trial court, Kratos was unaware of the liability concession in the
   Amended Answer filed by LBBS on December 14, 2007 and, upon learning of it, sought leave
   and was granted without objection permission to file an individual second amended answer.
28 (Doc. 85-5, pg. 23.)

On November 2, 2009, the trial court entered an Order Dismissing With Prejudice Plaintiffs' Complaint Against Defendant Kratos Defense & Security Solutions, Inc. (Doc. 98, pg. 79.)   The Order states: "IT IS ORDERED that Defendant Kratos Defense & Security Solutions, Inc. neither controlled nor had the right to control Defendant Stacy Rothwell-Muratore [sic] work at the time of the August 20, 2007 collision giving rise to Plaintiffs' Complaint and, as such, cannot be held vicariously liable for Defendant Muratore's conduct." (*Id.*)

**The *Peralta* Litigation Costs and the Settlement of the *Peralta* litigation**

The September 26, 2007 Complaint filed in the *Peralta* litigation alleged that Muratore was "acting as an employee/agent of and within the scope of her employment/agency with ABC Corporations 1-10 and/or XYZ Partnerships 1-10." (Doc. 85-4, pg.8.)   The defense in the *Peralta* litigation was initially tendered to National Union; National Union retained LBBS to defend the case.  (Doc. 116, pg. 46.)  On June 11, 2008, National Union sent a letter to Kratos' general counsel stating that its investigation had determined that Kratos, as the legal successor to WFI, was primarily responsible for the legal defense and indemnity of Burgundy, Kratos and Muratore.  (Doc. 83-6, pgs. 100-101.) Kratos tendered the defense of the case to St. Paul.  (Doc. 83, Ex. 8, Att. C.)  On August 27, 2008, counsel for National Union sent a letter to counsel for St. Paul stating that National Union was providing a defense in the *Peralta* litigation to "the defendants ... Burgundy, Muratore and Ms. Muratore's former employer, Wireless Facilities, Inc., now known as Kratos Defense & Security Solutions, Inc." (Doc. 85-6, pg. 31.)[9]  The letter alleged that St. Paul had a duty to defend and indemnify Kratos, Muratore and Burgundy under the St. Paul policies.  (Doc. 85-6, pg. 32.)  On October 15, 2008, counsel for St. Paul sent a letter to counsel for National Union stating that it had received National Union's tender of defense for the *Peralta* litigation and was investigating its coverage obligations.  (Doc. 85-6, pg. 38.)

---

[9] St. Paul objected to the admission of this document on the ground that National Union attempted to authenticate it with the affidavit of Ms. Malekos, who lacks personal knowledge. (Doc. 109-1, pg. 94.)  However, St. Paul also submitted this document as an exhibit.  (Doc. 98, Ex. 11.)

1    Ultimately, National Union did not fund any portion of the costs incurred by St. Paul

2  to defend Kratos.  (Doc. 116, pg. 107.)  St. Paul alleges that it paid for 50% ($179,234.92)

3  of Burgundy's defense and $108,968 in defending Kratos.[10]  (Doc. 116, pg. 107; Doc. 113,

4  pg. 16.)

5    On January 8, 2010, Peralta entered into a Settlement Agreement with "Wireless

6  Facilities, Inc., f/k/a Burgundy Acquisition Corporation ("WFI"), Kratos Defense & Security

7  Solutions, Inc. ("Kratos") and Stacy Rothwell Muratore."  (Doc. 85-7, pg. 11.)[11]  Although

8  the Settlement Agreement lists various insurance companies, including American Home and

9  ISP, as responsible for $4.1 million dollars in settlement payments to Peralta, it is undisputed

10  that St. Paul and National Union each paid $2,000,000 toward settlement of the *Peralta*

11  action.  (Doc. 109-1, pg. 91; 93; Doc. 116, pg. 107.)

12  **Pending Claims**

13    On July 28, 2010, St. Paul filed a Complaint against National Union, American Home

14  and ISP in Pima County Superior Court.[12]  (Doc. 1-3, pg. 5.)  Defendants removed the action

15  to federal court on August 27, 2010.  (Doc. 1.)  Plaintiff's complaint alleges five causes of

16  action against Defendants: (1) equitable contribution; (2) equitable subrogation; (3) equitable

17  indemnification; (4) declaratory relief - duty to defend; and (5) declaratory relief - duty to

18  indemnify.  (Doc. 1-3.)

19

20

21    [10] St. Paul's statement of facts alleges that St. Paul incurred $179,234.92 in defending

22  Burgundy but its Motion for Summary Judgment alleges $178,631.42.  (Doc. 113, pg. 16.)  In
addition, the Court has estimated St. Paul's defense costs for Kratos as $108,986 based on St.

23  Paul's assertion that it is entitled to reimbursement of 50% of those costs, or $54,484.  (Doc.
113, pg. 16.)  National Union has reserved the right to review the documentary evidence in

24  support of these facts.

25    [11] For the reasons stated in footnote 2, the Court rejects St. Paul's objections to admission
of the settlement document referenced by National Union.  Moreover, National Union is not

26  submitting the settlement document as proof of a matter asserted; the settlement amounts paid by
St. Paul and National Union are not in dispute.

27    [12] According to National Union, the parties have stipulated to the dismissal of American

28  Home and ISP from this action.  (Doc. 87, n.1.)  To date, no such stipulation has been filed with
the Court.  However, at oral argument, both parties stipulated to the dismissal.

1    On September 7, 2010, Defendants filed their Answer and Counterclaim to Plaintiff's

2  Complaint. (Doc. 8.)   The parties later stipulated to an amendment of Defendants' Answer

3  and Counterclaim; the Amended Answer and Counterclaim was filed on February 15, 2011.

4  (Doc. 36.)   National Union is the only counterclaimant in the Amended Answer and

5  Counterclaim; it alleges six counterclaims against St. Paul: (1) declaratory relief as to

6  Muratore's status as an insured; (2) declaratory relief as to Burgundy's status as an insured;

7  (3) declaratory relief as to St. Paul's position as the primary insurer; (4) equitable

8  contribution; (5) equitable subrogation; and (6) equitable indemnity.  (Doc. 36.)

9    The thrust of both parties' claims and defenses in this matter is that neither party

10  believes it has any liability for the *Peralta* settlement and both parties seek reimbursement

11  of the costs incurred in the *Peralta* litigation.

12                              **Standard of Review**

13    In deciding a motion for summary judgment, the Court views the evidence and all

14  reasonable inferences therefrom in the light most favorable to the party opposing the motion.

15  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eisenberg v. Insurance Co.*

16  *of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987).

17    Summary judgment is appropriate if the pleadings and supporting documents "show

18  that there is no genuine issue as to any material fact and that the moving party is entitled to

19  a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317,

20  322 (1986).  Material facts are those "that might affect the outcome of the suit under the

21  governing law." *Anderson*, 477 U.S. at 248.  A genuine issue exists if "the evidence is such

22  that a reasonable jury could return a verdict for the nonmoving party." *Id.*

23    A party moving for summary judgment initially must demonstrate the absence of a

24  genuine issue of material fact. *Celotex*, 477 U.S. at 325.  The moving party merely needs to

25  point out to the Court the absence of evidence supporting its opponent's claim; it does not

26  need to disprove its opponent's claim.  *Id.*; *see also* Fed. R. Civ. P. 56(c).

27    If a moving party has made this showing, the nonmoving party "may not rest upon the

28  mere allegations or denials of the adverse party's pleading, but . . . must set forth specific

1    facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  *See also*

2    *Anderson*, 477 U.S. at 256; *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th

3    Cir. 1995).  The nonmoving party may not "replace conclusory allegations of the complaint

4    or answer with conclusory allegations of an affidavit."  *Lujan v. National Wildlife*

5    *Federation*, 497 U.S. 871, 888 (1990).

6                                              **Analysis**

7          St. Paul and National Union both move for summary judgment on all claims.  In

8    addition, Defendants National Union, American Home and ISP contend that they should be

9    granted leave to amend their Amended Answer and Counterclaim.  The Court finds that St.

10   Paul is entitled to summary judgment and that National Union is not.   The Court further

11   finds that Defendants have failed to demonstrate good cause justifying amendment of their

12   Amended Answer and Counterclaim.

13   **I.      Cross Motions for Summary Judgment**

14         St. Paul seeks an order from this Court declaring that National Union breached its

15   equitable and contractual duties and is therefore liable for the $2 million settlement paid by

16   St. Paul and 50% ($54,484.00) of the fees and costs incurred by St. Paul in defending Kratos

17   in the *Peralta* litigation.  According to St. Paul, Burgundy and Muratore were covered under

18   the National Union Auto Policy and not covered by the St. Paul Auto Policy.  St. Paul further

19   contends that, even if its Auto Policy did provide coverage,  the National Union Umbrella

20   Policy is primary to the St. Paul policies.

21         National Union's motion for summary judgment seeks a contrary finding on each

22   issue presented in St. Paul's motion for summary judgment.  Essentially, National Union

23   seeks an order from this Court declaring that St. Paul is liable for the $2 million settlement

24   paid by National Union in the *Peralta* litigation.  According to National Union, Kratos,

25   Burgundy and Muratore were covered under the St. Paul Auto Policy and not covered by the

26   National Union Auto Policy.  National Union further contends that, even if its Auto Policy

27   did provide coverage, the St. Paul Umbrella Policy is primary to the National Union policies.

28

1    Both parties also seek recovery of fees in the *Peralta* litigation and this matter. Both
2    parties dispute who is responsible for the costs of defending Kratos and Burgundy in the
3    underlying litigation. St. Paul contends that National Union is responsible for 50% of the
4    fees incurred in defending Kratos in the *Peralta* litigation. National Union contends that it
5    had no obligation to defend any of the *Peralta* defendants, and therefore it is entitled to
6    equitable subrogation and recovery of all defense fees and costs incurred. The parties agree
7    that the prevailing party in this matter is entitled to attorneys' fees pursuant to A.R.S. § 12-
8    341.

9         The Court addresses the parties' claims as follows: with respect to the issue of which
10   insurance company was obligated to provide insurance coverage for the $4 million
11   settlement, the Court assesses first whether the *Peralta* decision is dispositive. Second, the
12   Court addresses whether the St. Paul and/or the National Union policies afforded coverage.
13   Third, if both policies afforded coverage, the Court will consider which policy was primary.
14   Fourth, the Court will consider which insurer is responsible for the costs of defense in the
15   *Peralta* litigation. Finally, the Court will address the claims for attorneys' fees.

16        **A.    The preclusive effect of the *Peralta* decision**

17        St. Paul contends that the trial court's ruling in *Peralta* is dispositive of the parties'
18   coverage obligations to Muratore in this case because the *Peralta* court held that Burgundy,
19   not Kratos, was vicariously liable for Muratore's negligence. According to St. Paul, because
20   the *Peralta* court found that Muratore was acting in the course and scope of her employment
21   for Burgundy at the time of the accident, the *Peralta* holding precludes this court from re-
22   litigating the employment issue in the context of determining insurance coverage. The Court
23   concludes that, while the terms of the relevant policies, APA and TSA were not fully litigated
24   in the *Peralta* court, several findings by the *Peralta* court do have preclusive effect in the
25   pending litigation.

26
27
28

Under Arizona law, collateral estoppel bars re-litigation by an insurer of issues as to which, in the underlying litigation, there was no conflict of interest.[13]  *See McGough v. Insurance Co. of North America*, 691 P.2d 738, 745 (App. 1984).[14]  If an insurer elects to defend the insured, the insurer is precluded in a subsequent action from contesting any facts essential to the judgment. *See Farmers Ins. Co. of Arizona v. Vagnozzi*, 675 P.2d 703, 706 (Ariz. 1983); *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982).  When National Union defended Burgundy in the *Peralta* litigation, it had a full and fair opportunity to litigate the relationship between Muratore and Burgundy and it consistently admitted Burgundy's liability for Muratore under a theory of *respondeat superior*.  (Doc. 85-5, pgs. 23-25.)  Having been given the opportunity to appear on behalf of Burgundy in the tort suit to protect National Union and Burgundy's common interest, National Union is bound by the *Peralta* judgment.  *Vagnozzi*, 675 P.2d at 706 (citing   RESTATEMENT (SECOND) OF JUDGMENTS § 57, comment (a), at 78.  The Court holds that the following findings by the *Peralta* court have preclusive effect in this case: (1) "Burgundy's pleadings admit vicarious liability over Muratore's actions"; (2) "the circumstances establish that Muratore was performing work for Burgundy, in pursuit of [Burgundy's] business, subject to her compliance with Burgundy's 'standards of business conduct, policies and procedures'"; (3) the TSA "makes Burgundy 'solely responsible' for Muratore's activities for the date in question"; and (4) Kratos "neither controlled nor had the right to control [Muratore] ... at the time of the [collision] ... and, as such, cannot be held vicariously liable for Defendant Muratore's conduct."  (*Id*.)  However, there is no evidence to suggest that the terms of the relevant insurance policies were at issue in the *Peralta* litigation.  Similarly, although Burgundy attempted to litigate the effect of the APA on the parties' liability for Muratore, the trial court rejected its attempts to do so and concluded that Burgundy could bring suit

---

[13] National Union has not asserted that it had a conflict of interest with Burgundy in the underlying *Peralta* litigation.

[14] St. Paul's reliance on *Taylor v. Sturgell*'s definition of collateral estoppel is misplaced, as its holding is limited to "the preclusive effects of a judgment in a federal-question case decided by a federal court."  553 U.S. 880, 904 (2008).

1   against Kratos in a different forum in order to enforce those claims.[15]  (Doc. 85-5, pg. 54.)

2   Accordingly, those issues remain subject to litigation in the present matter.

### B.     Coverage under the St. Paul Auto Policy [16]

4         The St. Paul Auto Policy states that it provides coverage for "amounts any protected

5   person is legally required to pay as damages for covered bodily injury or property damage

6   that results from the ownership, maintenance, use, loading or unloading of a covered auto and

7   is caused by an accident that happens while this agreement is in effect."  (Doc. 85-1, pg. 8.)

8   The parties dispute two key provisions of the St. Paul Auto Policy: (1) who is a "protected

9   person" and (2) whether Muratore's rental vehicle was a "covered auto."  In order to be

10  covered by the St. Paul Auto Policy, the "protected person" and "covered auto" definitions

11  must both be met.

### 1.     The Rental Vehicle was not a "covered auto"

13        The St. Paul Auto Policy applies to autos as described in the Coverage Summary.

14  (Doc. 85-1, pg. 10.)  The Coverage Summary lists several possible coverage options: "any

15  auto, scheduled autos, owned commercial autos, hired autos, owned private passenger autos

16  and non-owned autos."  (Doc. 85-1, pgs. 4, 6.)  With respect to Auto Liability Protection,

17  only the box next to "Any auto" is marked.  (*Id*.)  "Any auto" is defined as "any owned,

18  rented, leased or borrowed auto ... [including] hired autos."  (Doc. 85-1, pg. 11.)  "Hired

19  auto" is defined as "any auto that you hire, rent, lease or borrow from others.  . . . any auto

20  that an employee of yours hires, rents, leases, or borrows from others in that employee's

21  name with your permission while performing duties related to the conduct of your business."

22  (Doc. 85-1, pg. 18.)

23        Neither Muratore nor Burgundy are protected by the St. Paul Auto Policy because the

24  Rental Vehicle was not a "covered auto" within the meaning of the Policy.  The Rental

25

26        [15] National Union does not argue in the pending action that Kratos had a duty to indemnify Burgundy under the APA.

27        [16] The *Peralta* court entered partial summary judgment on the issue of liability only against Muratore and Burgundy.  Accordingly, this Court is charged with the task of assessing
28  the extent to which Muratore's and Burgundy's liabilities are covered by the policies at issue.

Vehicle does not fall within the "rented, leased or borrowed auto" category of the "any auto" definition because WFI did not rent the auto; although Muratore charged the Rental Vehicle to an Enterprise account established by WFI in December, 2005, WFI did not instruct Muratore to undertake the trip or to rent the vehicle in which she was traveling at the time of the accident.  Nor does the Rental Vehicle fall within the "hired auto" category of the "any auto" definition: regardless of whether Muratore was an employee of WFI, the *Peralta* court has conclusively found that Muratore was performing duties related to the conduct of Burgundy's, not WFI's, business at the time of the accident.

### 2.    Neither Muratore nor Burgundy qualify as a "protected person" under the St. Paul Auto Policy

Even if the Rental Vehicle was considered a "covered auto," neither Muratore nor Burgundy can be considered "protected persons" within the meaning of the St. Paul Auto Policy.  The Policy provides coverage for four categories of drivers:

1.    The Permissive User: "any person to whom you've given permission to use a covered auto you own, rent, lease, hire or borrow";

2.    The Protected Employee: "any employee of yours is protected while using a covered auto you don't own, hire or borrow in your business or your personal affairs";

3.    The Employee Renter: "any of your employees while operating a covered auto that has been rented, leased, hired, or borrowed from others in that employee's name with your permission while performing duties related to the conduct of your business"; and

4.    The Legally Responsible Party: "any person or organization who is legally responsible for the actions of a protected person."

(Doc. 85-1, pgs. 12, 18, 19.)

Muratore does not fall within the scope of coverage under the St. Paul Auto Policy because she was not a "protected person" within the meaning of the Policy.  Muratore does not fall within the "Permissive User" or "Employee Renter" provisions because WFI did not give Muratore permission to use the Rental Vehicle: Deputy General Counsel for Kratos testified that WFI did not instruct Muratore to undertake the trip or to rent the vehicle in

which she was traveling at the time of the accident.[17]   Instead, the Project Manager authorized Muratore to rent a vehicle from Enterprise using WFI's corporate account.[18]   In addition, the *Peralta* court previously determined that Muratore was performing work for Burgundy and that WFI neither controlled nor had the right to control Muratore at the time of the collision.

Muratore does not fall within the "Protected Employee" or "Employee Renter" provisions because she was not an employee of WFI at the time of the accident.  The St. Paul Auto Policy does not provide a definition for the term "employee."  When the word "employee" appears in a contract of insurance and is not defined in the policy, it must be construed in the manner most likely to correspond to the intention of the parties to the contract. *See Arizona Property and Cas. Ins. Guar. Fund v. Dailey*, 751 P.2d 573, 574 (Ariz. App. 1987) (citing *Eagle Star Insurance Company, Ltd. v. Deal*, 474 F.2d 1216 (8th Cir. 1973)).  "The intention fairly attributable to the insurer and the insured, from an objective standpoint and in the absence of a contrary indication should therefore reflect the ordinary meaning of the word as it is understood by persons generally and should highlight the characteristics which the law most often attributes to employment."  *Id.* at 575.  Under Arizona law, "the key word 'employee' is clear and unambiguous when considered in its ordinary, plain and popular meaning. The layman assured who purchases a policy would

[17] National Union argues that Deputy Counsel's declaration denying that WFI instructed Muratore to rent the vehicle is contradicted by the APA, which National Union characterizes as containing "the only relevant instruction" - that being "WFI's instruction to Muratore to perform her job."  (Doc. 106, pg. 4.)  However, nothing in the APA can be reasonably construed as allocating employee direction to WFI during the Transition Period.  Instead, the provisions of the APA cited to by National Union suggest that WFI will continue to manage various employee benefits and payroll systems during the Transition Period.

[18] National Union cites to *State Farm Mut. Auto. Ins. Co. v. Williamson*, 331 F.2d 517 (9th Cir. 1964) to suggest that WFI gave Burgundy permission to use its Enterprise rental account, and that Burgundy in turn gave Muratore permission to use the rental account, therefore Muratore should be considered a "permissive user."  *Williamson* addresses coverage under an "omnibus clause," a required provision within an auto liability insurance policy that extends coverage to permissive users of covered autos.  Although *Williamson* recognizes that "where the named insured grants his permittee broad and unfettered dominion over his insured automobile, he also impliedly authorizes his permittee to allow a third person to use it, and thus to render him an additional insured," it does not apply in this case.  Burgundy has not presented any evidence to support its claim that WFI gave Burgundy permission to use the Enterprise rental account in question.

have little difficulty in ascribing to the term 'employee' a certain well-known concept, namely, an individual who works for the assured for compensation and is subject to his direction and control." *Id.* at 575 (citing *Petronzio v. Brayda*, 350 A.2d 256, 259 (N.J. Sup. Ct. 1975)); *see also* A.R.S. §23-613.01 ("'Employee' means any individual who performs services for an employing unit and who is subject to the direction, rule or control of the employing unit as to both the method of performing or executing the services and the result to be effected or accomplished.").

Muratore was not a WFI employee within the ordinary meaning of the word: the TSA provides that, while WFI managed the payroll for the leased employees, Burgundy would reimburse WFI for the leased employees' wages and taxes (Doc. 85-3, pg. 19), and the *Peralta* court concluded that Burgundy had exclusive control over Muratore's actions at the time of the accident. Burgundy argues, however, that regardless of the ordinary meaning of the term "employee," it was the parties' intention that Muratore be considered an employee within the meaning of the St. Paul Auto Policy. In support of this claim, National Union cites to: (1) the fact that the APA requires WFI to retain its corporate charter, which it did; (2) the APA and TSA's identification of Muratore as a "leased employee"; (3) Section 6.5.1 of the APA, which states "Except as otherwise specifically provided herein, Seller shall retain, and Purchaser shall not assume, any employer or employee related obligations or Liabilities to the Transferred Employees arising before the date they become Transferred Employees"; (4) Section 6.5.2 of APA, which states "Seller agrees to remain the employer of record of the Leased Employees, to permit the Leased Employees to continue to participate in the Seller Benefit Plans on the same terms and conditions as in effect immediately before the Closing Date, and to lease said Leased Employees to the Purchaser pursuant to the Transition Services Agreement for the Leasing Period"; (5) Schedule A of the TSA, which provides that WFI will offer various human resources and benefits services to Burgundy during the Transition Period; (6) the fact that WFI and Kratos did not officially merge until September 12, 2007; and (7) the July 26, 2007, letter from Burgundy to Muratore offering employment  (Doc. 84, pg. 7.)  Each of these alleged facts may have some bearing

on the intent of WFI and Burgundy when they entered into the APA and TSA, but "intent" for purposes of construing an insurance contract refers to the "intent of the parties to the insurance contract." See *Dailey*, 751 P.2d at 574 (citing *Eagle Star Insurance Company, Ltd. v. Deal*, 474 F.2d 1216 (8th Cir.1973)).  In other words, the issue before the Court is whether WFI and St. Paul intended for Muratore to be an employee within the meaning of the St. Paul Auto Policy during the Transition Period.

There is no evidence from which the Court could conclude that WFI and St. Paul intended to provide insurance coverage for Muratore as WFI's employee during the Transition Period. At best, the communications between WFI and Burgundy arguably give rise to an inference that WFI believed it was the "employer of record" for leased employees with regard to payroll and benefits.  Although the APA contains ambiguous reference to WFI's retained "employee related obligations or Liabilities," the TSA states that WFI "shall relinquish day-to-day operational control of the Leased Employees to [Burgundy] and [Burgundy] shall be solely responsible for the Leased Employees' activities and performance, including but not limited to providing the appropriate supervision for such Leased Employees." (Doc. 85-3, pg. 18.)  This Court is also bound by the *Peralta* court's finding that the TSA "makes Burgundy 'solely responsible' for Muratore's activities for the date in question."  In sum, the APA and TSA do not demonstrate WFI's intent to retain insurance liability for leased employees.  In fact, to the contrary, it appears that WFI intended to exclude leased employees from its insurance coverage.  The communications between WFI and St. Paul during mid-2007 demonstrate that WFI reduced its auto insurance coverage on July 24, 2007 due to the sale of its commercial wireless division to Burgundy.  In an endorsement effective July 24, 2007, WFI reduced its hired or borrowed auto liability from $1,000,000 to $400,000.  (Doc. 83-2, pgs. 92-93.)[19]  This reduction suggests that WFI

---

[19] National Union objects to St. Paul's characterization of this evidence as a reduction in insurance coverage, arguing that it could be construed as a reduction in premiums from one year of coverage to a few months of coverage for the Transition Period. (Doc. 116, pgs. 22-24.) This inference is not supported by the record, however.  WFI's insurance broker described this reduction as an amendment to exposure "to reflect the sale of the deployment group." (Doc. 83-6, pg. 45.)  In addition, the insurance broker requested "changes to the program as the exposure

1   believed it had less employee-liability risk and less need for auto coverage during the

2   transition period.[20]   Given these facts, the Court concludes that National Union has failed to

3   demonstrate a "contrary indication" that WFI and St. Paul intended something other than the

4   plain meaning of "employee" as the word is used in the St. Paul Auto Policy.

5           In sum, Muratore does not fall within any of the four possible categories of "protected

6   person" within the meaning of the St. Paul Auto Policy.   Because Muratore is not a

7   "protected person," Burgundy cannot be considered a "Legally Responsible Party" - that

8   provision only applies to an organization that is  "legally responsible for the actions of a

9   protected person."   Thus, neither Muratore nor Burgundy are covered by the St. Paul Auto

10  Policy.

11          **C.      Coverage under the St. Paul Umbrella Policy**

12          The St. Paul Umbrella Policy provides protection for "amounts any protected person

13  is legally required to pay as damages for covered bodily injury or property damage that:

14  happens while this agreement is in effect; and is caused by an event."  (Doc. 85-1, pg. 25.)

15  A "protected person" is defined as "any person or organization that qualifies as a protected

16  person under the Who Is Protected Under This Agreement" section; that section provides

17  protection to "any person or organization that's a protected person under your automobile

18  Basic Insurance for the use of an auto."  (Doc. 85-1, pg. 33.)  Muratore and Burgundy are not

19  "protected persons" under St. Paul's Auto Policy, thus, St. Paul's Umbrella Policy does not

20  apply.

21

22  _____

23  has changed" due to "sale of the deployment group ... on 7-24-07." (Doc. 83-6, pg. 50.)  The
    broker also stated that reducing auto coverage for the "deployment group" effective July 24,

24  2007 would be "really good for St. Paul as most of the losses stemmed from engineering and
    deployment which is not an exposure on a going forward basis." (*Id*.)  Thus, the broker's

25  communications with St. Paul illustrate an intent to reduce exposure, *i.e.* coverage, effective July
    24, 2007.

26          [20]National Union also claims that the Marsh documents were not properly disclosed
    because National Union never received a copy of the subpoena allegedly served on Marsh.

27  (Doc. 102-5, pg. 2).  However, according to St. Paul, they disclosed the documents obtained
    from the subpoena and identified Marsh's keeper of records as a potential witness in their 1st

28  Supplemental Disclosure. (Doc. 116, pg. 182.)

1    Because St. Paul was not obligated to provide coverage for Muratore or Burgundy

2    under its Auto and Umbrella Policies, National Union is not entitled to summary judgment

3    with respect to its claims of declaratory relief as to Muratore's status as an insured,

4    declaratory relief as to Burgundy's status as an insured or declaratory relief as to St. Paul's

5    position as the primary insurer.  National Union is also not entitled to summary judgment

6    with respect to its claims for equitable contribution, subrogation or indemnity to the extent

7    those claims seek reimbursement of National Union's portion of the $4 million *Peralta*

8    settlement.

9           **D.    Coverage under the National Union Auto Policy**

10           National Union's Auto Policy provides "we will pay all sums an 'insured' legally

11   must pay as damages because of 'bodily injury' or 'property damage' to which this insurance

12   applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a

13   covered 'auto.'" (Doc. 85-1, pg. 75.)   An "insured" is defined to include "anyone ... using

14   with your permission a covered 'auto' you own, hire or borrow," "any 'employee' of yours

15   ... using a covered 'auto' you don't own, hire or borrow in your business or your personal

16   affairs," and "anyone liable for the conduct of an 'insured' described above but only to the

17   extent of that liability."  (Doc. 85-1, pgs. 75-76, 92.)  St. Paul asserts that Muratore and

18   Burgundy were "insured" because: (1) Muratore was a Burgundy "employee"; (2) Muratore

19   was  using a "covered auto"; (3) Muratore, not Burgundy, borrowed the Rental Vehicle for

20   Burgundy business; and (4) because Muratore was an insured, Burgundy was also covered

21   by the National Union Policy as an entity "liable for the conduct of an insured."  National

22   Union disputes each of these claims.  The Court concludes that the undisputed facts satisfy

23   all four elements.

24          First, Muratore was an employee of Burgundy within the meaning of the National

25   Union Auto Policy.  Like the St. Paul Auto Policy, the National Union Policy does not

26

27

28

provide a definition of the term "employee."[21]   Accordingly, the Court applies the plain meaning of the term absent evidence of a contrary intent of the parties.  As stated in section I.B.2, above, Muratore was an employee of Burgundy's at the time of the accident because she was compensated by Burgundy and subject to Burgundy's direction and control.  *See Dailey*, 751 P.2d at 575 (defining "employee" as "an individual who works for the assured for compensation and is subject to his direction and control.")  Burgundy reimbursed WFI for Muratore's wages pursuant to the TSA.  Pursuant to the *Peralta* decision, Muratore was also subject to Burgundy's exclusive direction and control.

Second, Muratore was using a "covered auto."  National Union asserts that the definition of "covered auto" was modified by Endorsement #5, which limits covered to "hired and non-owned autos."  (Doc. 85-1, pg. 63.)[22]  A "hired auto" is defined as "an auto you lease, hire, rent or borrow."  (Doc. 85-1, pg. 74.)  A "non-owned auto" is defined as "those autos you do not own, lease, hire, rent or borrow that are used in connection with your business."  (*Id*.)  The Rental Vehicle was either rented by Muratore or Burgundy; the undisputed evidence demonstrates that WFI did not authorize the rental and that the Project Manager, leased to Burgundy at the time, instructed Muratore to obtain a Rental Vehicle.  If Burgundy rented the vehicle, it was a "hired auto" within the meaning of the policy.  If Muratore rented the vehicle, it was a "non-owned auto" because the *Peralta* court has already conclusively determined that, at the time of the accident, Muratore was driving the Rental

---

[21] The National Union Auto Policy does state that "employee" includes "leased worker," but then defines "leased worker" as "a person leased to you by a labor leasing firm."  (Doc. 85-1, pgs. 82-83.)  Because there is no rational basis from which to conclude that WFI could be described as a labor leasing firm, this provision does not apply.

[22] The National Union Auto Policy as originally drafted provides liability insurance for "any auto," defined as "a land motor vehicle, trailer or semitrailer designed for travel on public roads."  (Doc. 85-1, pgs. 74, 82.)  Under this provision, the Rental Vehicle would clearly be afforded coverage.  St. Paul disputes the validity of Endorsement #5 and its amendment of the term "any auto."  Although the Endorsement states an effective date of July 24, 2007, St. Paul contends that the Endorsement was issued in August or October, 2008, with a retroactive effective date of July 24, 2007, and is therefore void pursuant to A.R.S. § 20-1123, which precludes liability insurers from retroactively annulling coverage after injury has occurred. (Doc. 85-1, pg. 63.)   The Court refrains from adjudicating this dispute, however, because the Rental Vehicle is covered even under Endorsement #5's more limited definition of "covered auto."

1   Vehicle in connection with Burgundy's business.  Either way, the Rental Vehicle is a

2   "covered auto" within the meaning of the National Union Auto Policy.

3          The Court's finding with respect to the second element of coverage is also conclusive

4   as to the third: the *Peralta* court has already determined that Muratore borrowed the Rental

5   Vehicle for Burgundy business.  As the *Peralta* court held, "Burgundy's pleadings admit

6   vicarious liability over Muratore's actions" and "the circumstances establish that Muratore

7   was performing work for Burgundy, in pursuit of [Burgundy's] business, subject to her

8   compliance with Burgundy's 'standards of business conduct, policies and procedures'" at the

9   time of the accident.[23]

10          Fourth, the Peralta court previously determined that Burgundy is the entity liable for

11   Muratore's conduct under the theory of *respondeat superior*.  Accordingly, Muratore and

12   Burgundy are both "insured" within the meaning of the National Union Auto Policy.

13          **E.      Coverage under the National Union Umbrella Policy**

14          National Union contends that, even if its Auto Policy provided coverage to Muratore

15   and Burgundy, its Umbrella Policy did not.

16          The National Union Umbrella Policy was issued on June 6, 2007 to Platinum Equity,

17   LLC. (Doc. 85-2).  It provides that it will pay on behalf of the insured  "those sums in excess

18   of the Retained Limit that the Insured becomes legally obligated to pay as damages by reason

19   of liability imposed by law ... to which this insurance applies ... if the [event giving rise to

20   liability] occurs during the policy period."  (Doc. 85-2, pg. 37.)  A series of endorsements

21   are attached to the Umbrella Policy.  Endorsement #61, effective July 24, 2007, states that

22   "Burgundy Holding Company" is a named insured under the policy "solely as respects to the

23   operation of WFI."  (Doc. 85-2, pg. 3.)  Endorsement #39, effective July 24, 2007, lists

24

25

---

26          [23] The Court rejects National Union's assertions that WFI rented the Rental Vehicle. As
     stated in section I.B., the undisputed evidence demonstrates that WFI did not authorize the rental
27   or instruct Muratore to rent a vehicle.  To the contrary, if someone other than Muratore rented
     the vehicle, it was Burgundy: the Project Manager supervising Muratore who authorized the
28   rental was leased to Burgundy at the time and acting under Burgundy's supervision.

Burgundy as a named insured.[24]  (Doc. 85-2, pg. 26.)  Endorsement #47, effective July 24, 2007, nullifies Endorsement #39 and does not list Burgundy as a named insured.  (Doc. 85-2, pg. 7.)  Endorsement #42, effective October 3, 2007, nullifies Endorsement #39 and lists Burgundy as a named insured.  (Doc. 85-2, pgs. 20-21.) Endorsement #50, effective October 3, 2007, nullifies Endorsement #42 and lists Burgundy as a named insured.  (Doc. 85-2, pg. 5.)  Endorsement #51, effective November 14, 2007, states that Burgundy has changed its name to WFI.  (Doc. 85-2, pg. 4.)

In construing the coverage afforded by National Union's Umbrella Policy and its various endorsements, Arizona law directs the Court to look to the policy's plain meaning. *Travelers Indemnity Co. v. State*, 680 P.2d 1255, 1258 (Ariz. App. 1984).  Generally, endorsements may limit or change a policy only as specifically set out in the endorsement. *See Exchange Ins. Co. v. Mar-Fran Enterprises, Inc*., 169 Ariz. 187, 818 P.2d 172, 173 (Ariz. App. 1991).  The plain meaning of the Umbrella Policy and its Endorsements is as follows: Endorsement #39 provided coverage to Burgundy effective July 24, 2007.  On that same date, Endorsement #39 was superceded by Endorsement #47, which omitted Burgundy from coverage.  The reasonable inference is that coverage was instead allotted to "Burgundy Holding Company … [with respect to] the operation of WFI" via Endorsement #61 on that same date.   On October 3, 2007, Endorsement #42 added Burgundy as a named insured; however, on that same date Endorsement #42 was nullified and superceded by Endorsement #50, which also lists Burgundy as a named insured.[25]   Thus, it appears that Burgundy was not a named insured under the National Union Umbrella Policy until October 3, 2007.

The Court's inquiry does not end there, however, because St. Paul challenges application of the plain-meaning of the National Union Umbrella Policy on two grounds:

---

[24] At least one endorsement, Endorsement #37, was not included in the exhibits provided by National Union.  St. Paul attached it as an exhibit at Doc. 83-4, pg. 61.  Endorsement #37 does not list Burgundy as a named insured.  The effective date of Endorsement #37 is July 12, 2007.  Endorsement #37 was nullified by Endorsement #39.

[25] Because Endorsement #42 purported to nullify Endorsement #39, which had already been nullified by Endorsement #47, it is possible that it was entered in error and immediately retracted and replaced by Endorsement #50.

first, St. Paul contends that Endorsements #47 and #50 were not actually issued until after the accident, and therefore violate A.R.S. 20-1123, and second, St. Paul claims that National Union should be estopped from denying Umbrella Policy coverage based on its conduct in the *Peralta* litigation.

A.R.S. § 20-1123 provides that "no insurance contract insuring against loss or damage through legal liability for the bodily injury or death by accident of any individual, or for damage to the property of any person, shall be retroactively annulled by any agreement between the insurer and the insured after the occurrence of any injury, death or damage for which the insured may be liable, and any attempted annulment shall be void."  St. Paul's claim that Endorsements #47 and #50 were not issued until after the accident, and are therefore void, is based upon handwritten notations made to the "forms schedule" cover sheet attached to the endorsements.  The forms schedule for Endorsement #47 appears to state "ok . . . 2/12/08," which leads St. Paul to argue that the Endorsement was not actually issued until February, 2008.  (Doc. 101, Ex. 3.)  National Union disputes the legal significance of this notation, and points out that if such notations are to be given weight, the Court must also consider that Endorsement #39 - the Endorsement which would give rise to coverage for Burgundy - bears a similar handwritten notation which appears to assign an issue date of "10/20/07."  (Doc.  109-5, pg. 5.)  Thus, even if the Court did credit St. Paul's evidence, Burgundy would still not be a named insured under the Umbrella Policy at the time of the accident.

More troubling to the Court, however, is the extensive evidence suggesting that National Union did not show its hand regarding its claim that Burgundy was not a named insured under the Umbrella Policy until the dispositive motion deadline.  As a threshold matter, National Union appeared to admit coverage for Burgundy in its Amended Answer and Counterclaim: at paragraph 23, National Union admitted that "Burgundy is an insured

under the Policies."[26]   (Doc. 36, pgs. 5-6.)  At paragraph 113, National Union affirmatively alleged that it issued the Umbrella Policy to Platinum Equity "under which Burgundy was an insured."  (Doc. 36, pgs. 22-23.)   National Union did not explicitly deny coverage under the Umbrella Policy in any previous court filings.   Instead, during the course of this litigation, National Union has framed its case as follows:

> the Peralta matter involved a covered auto within the terms of the St. Paul policy's primary and excess coverage; that Muratore, Burgundy and Kratos qualify as insureds pursuant to the terms of the St. Paul policy with regard to the Peralta litigation; and that as to the priority of coverage between the parties, all primary and excess coverage available under the St. Paul policy applies before any coverage available to any Peralta Defendant under the National Union policies.

(Joint Report, Doc. 24, pgs. 5-6.)[27]  There is nothing in the record to suggest that St. Paul was on notice of this potential "not-a-named-insured" defense during discovery.  To the contrary, in response to St. Paul's interrogatory requesting discovery related to the legal and factual bases of National Union's affirmative defenses, National Union stated that it did not have any information beyond that alleged in its Amended Answer.  (Doc. 98-4, pgs. 50-51.)  National Union's claim that Burgundy was not a named insured under the Umbrella Policy does not appear in National Union's Rule 26 disclosure statements.  (Doc. 98-4, pgs. 2-17.)  National Union's 30(b)(6) witness also testified "we were defending our named insured that appears on the policy, Burgundy."  (Doc. 66, pg. 11.)  Had St. Paul known that National Union intended to deny coverage pursuant to the Endorsements, it might taken other discovery measures to rebut this defense, such as seeking more persuasive discovery regarding the

---

[26] National Union's Motion for Leave to File a Second Amended Answer and Counterclaim seeks to amend paragraph 23 to state "Burgundy is an insured under the Policies and that the Policies provide coverage pursuant to the express terms, conditions, exclusions and endorsements to those Policies." (Doc. 86-1, pg. 7.)

[27] The only portion of the Court's record that supports National Union's claim that it put St. Paul on notice of its intent to deny coverage under the Umbrella Policy is Affirmative Defense #22 (out of 53), which states "the terms, conditions, endorsements, exclusions and/or provisions of the Policies result in no coverage and no potential for coverage for indemnity and/or defense obligations based upon the claims made in the Peralta Litigation and/or by St. Paul as described in the complaint."  (Doc. 36, pg. 14.)  Because it is so generally worded, this Affirmative Defense could also describe National Union's claim that the St. Paul policy was primary to the National Union policy.  The Court finds this argument by National Union to be unpersuasive at best and insincere at worst.

dates that the Endorsements were issued in support of its A.R.S. 20-1123 claim. Instead, it appears that National Union consistently led St. Paul to believe that its defense and counterclaim rested soundly on its position that the St. Paul policy applied and was primary.

The state court record is similarly devoid of any suggestion that National Union intended to deny coverage under its Umbrella Policy. During the *Peralta* litigation, National Union defended Burgundy without a reservation of rights.[28]   When counsel for the Peraltas requested a copy of the National Union Umbrella Policy, National Union initially refused the request, claiming that disclosure was not necessary because the Peralta plaintiffs already knew the Umbrella Policy's limit and that National Union had not made any reservation of rights – thereby suggesting that the Umbrella Policy would afford coverage in the event of settlement. (Doc. 98-3, pg. 6.)[29]   In addition, there is evidence to suggest that the Umbrella Policy disclosed by National Union in the *Peralta* litigation and during discovery in this litigation did not include Endorsement #47. (Doc. 116, pg. 162.)[30]  Finally, correspondence from National Union's attorney in the *Peralta* litigation indicates that National Union presented the same defenses in state court as they initially presented in this Court: that St. Paul's policies applied to Muratore and that the APA required Kratos to indemnify Burgundy. (Doc. 85, Exs. 35, 39 & 41.)

---

[28]Although National Union disputes this fact, it has presented no evidence to contradict St. Paul's allegation that no reservation of rights letter was ever sent by National Union to Burgundy. Instead, National Union claims that it implicitly reserved its rights when it tendered defense of the *Peralta* litigation to St. Paul on the ground that Muratore was WFI's employee and therefore Kratos had an obligation to indemnify Burgundy under the APA. Such communication does not constitute a reservation of rights, as it was not directed to Burgundy, National Union's insured. *See Mut. Ins. Co. of Ariz. v. Bodnar*, 793 P.2d 560, 565 (App.1990) (if an insurer provides a defense to its insured under a reservation of rights, it must communicate its reservation of rights to the insured to inform the insured of its position as to coverage). Furthermore, National Union admitted during discovery that it did not issue a reservation of rights letter to Burgundy, and admitted in a previous filing that its claims adjuster designated as National Union's 30(b)(6) witness testified in her deposition that no reservation of rights letter was sent to Burgundy. (Doc. 109-5, pg. 53; Doc. 66, pg. 10; 66-2, pg. 15).

[29] National Union objected to the admission of this email on relevance grounds, but admitted that "the content of the [emails] are undisputed." (Doc. 109-1, pg. 107.)

[30] St. Paul filed what it believed to be the National Union Umbrella Policy as an exhibit to its Statement of Facts; St. Paul claims that the version it filed is the same version that was disclosed to it by National Union in the *Peralta* litigation and in discovery in this case. The St. Paul version of the Umbrella Policy does not include Endorsement 47.

1    Given this litigation history, especially the fact that National Union did not reserve

2   its rights as to Burgundy in the *Peralta* litigation, the Court finds it appropriate to apply the

3   doctrine of equitable estoppel and bar National Union from denying coverage under the

4   Umbrella Policy in the pending action.  *See Pueblo Santa Fe Townhomes Owners Assoc. v.*

5   *Transcontinental Ins. Co.*, 178 P.3d 485, 492-93 (Ariz. App. 2008) (applying doctrine of

6   equitable estoppel to bar insurer from denying coverage for insured in subsequent litigation

7   against party to Morris agreement with insured); *see also Peerless Ins. Co. v. Travelers Ins.*

8   *Co.*, 393 F.2d 636 (9th Cir. 1968) (in contribution action between insurers, under Arizona

9   law, insurer is estopped from denying coverage because it had unconditionally accepted the

10   tender of defense made by the insured).  To hold otherwise would work a plainly unjust

11   result: the parties to the *Peralta* litigation entered into a $4 million settlement with the

12   Peraltas following the trial court's finding that Burgundy was exclusively liable for the

13   damages to the Peraltas.  If the parties to the *Peralta* litigation had been aware of National

14   Union's position that its coverage for Burgundy - the only liable defendant -- was limited to

15   the $1 million provided in its Auto Policy, the parties would likely have managed litigation

16   strategies and settlement negotiations differently, as Burgundy would have had potential

17   uninsured liability.  Moreover, if National Union's liability in this action were limited to the

18   $1 million limit of National Union's Auto Policy, St. Paul would be forced to bear a $1

19   million burden despite the fact that St. Paul's policies do not obligate St. Paul to fund any

20   portion of the *Peralta* settlement.  Accordingly, the Court concludes that National Union is

21   equitably estopped from denying coverage under its Umbrella Policy.

22    Because National Union was obligated to provide coverage for Burgundy under its

23   Auto and Umbrella Policies, St. Paul is entitled to summary judgment on its claims for

24   equitable contribution, equitable subrogation, equitable indemnification and declaratory relief

25   with respect to the $2 million paid by St. Paul toward the *Peralta* settlement.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### F.      Which policy was primary

Because the Court concludes that neither the St. Paul Auto Policy nor the St. Paul Umbrella Policy affords coverage to Muratore or Burgundy, the Court need not determine whether the St. Paul or National Union policies are primary.

### G.      Costs of defense

The parties dispute their obligations to bear the cost of defense in the *Peralta* litigation.  Under Arizona law, an insurer is expressly obligated to defend any claim against an insured that is potentially covered by the policy.  *See United Services Auto. Ass'n v. Morris*, 741 P.2d 246, 250 (Ariz. 1987).  Under the doctrine of equitable contribution, an insurer who has paid a claim may seek contribution directly from other carriers that are liable for the same loss. *See American Family Mut. Ins. Co. v. National Fire & Marine Ins. Co.*, 2009 WL 2870188, *5 (D. Ariz. 2009) (citing *Western Agricultural Ins. Co. v. Indus. Indem. Ins. Co.,* 838 P.2d 1353, 1355 (Ariz. App.1992)).

St. Paul seeks equitable contribution for the costs it incurred in defending Kratos.  National Union contends that because it had no obligation to defend Muratore, Burgundy or Kratos with regard to the *Peralta* litigation, and because those parties held rights that could have been asserted against St. Paul for coverage, St. Paul should reimburse National Union for the costs of its defense.  Based on the *Peralta* litigation records and the communications of the various parties to that litigation, the Court concludes that Muratore, Kratos and Burgundy were all potential insureds under both the St. Paul and the National Union policies from September 26, 2007, when the Complaint was filed, until October 13, 2009, when the trial court issued its order identifying Burgundy as solely liable for Muratore's actions.

For the reasons stated in section I.D., National Union had an obligation to defend Muratore and Burgundy.  Accordingly, it is not entitled to more than the 50% of defense costs that St. Paul has already paid with respect to those defendants.  In addition, Kratos was a potential insured under National Union's policy.  The National Union Auto policy provided coverage for "anyone liable for the conduct of an "insured." (Doc. 85-1, pg. 76.)  As stated in section I.D., Muratore was an "insured" under the National Union Auto Policy.  The

1   Complaint broadly alleged that Muratore was acting in the course and scope of an employer
2   who was not specifically identified until January 26, 2009, at which time the First Amended
3   Complaint alleged that Muratore was employed by both WFI and Burgundy.  It was not until
4   the trial court's October 13, 2009 order that the parties were on notice that Burgundy, not
5   Kratos, was liable for Muratore's conduct.  Thus, at all times preceding the October 13, 2009
6   order, Kratos was conceivably an entity "liable for the conduct of an 'insured'" within the
7   meaning of the National Union policy.  National Union therefore had an obligation to defend
8   Kratos in the underlying litigation.  Accordingly, National Union is not entitled to summary
9   judgment on its claims of equitable contribution, subrogation or indemnity with respect to
10  the costs of defending Muratore, Burgundy or Kratos in the *Peralta* litigation.  Conversely,
11  St. Paul is entitled to summary judgment on its claims of equitable contribution, subrogation
12  and indemnification with respect to the costs of defending Kratos.  St. Paul is also entitled
13  to summary judgment on its claims for declaratory relief with respect to National Union's
14  duty to defend.

15  **H.    Attorneys' Fees**

16       The parties agree that the prevailing party in this matter is entitled to attorneys' fees
17  pursuant to A.R.S. § 12-341.  (Doc. 1-3, pg. 13; Doc. 84, pg. 18.)  For the reasons stated
18  herein, the Court finds that St. Paul is the prevailing party.  Accordingly, St. Paul may file
19  a memorandum in support of its claim for attorneys' fees pursuant to LR54.2(b)(2).

20  **II.    Motion for Leave to File a Second Amended Answer and Counterclaim**

21       National Union seeks leave to amend its Amended Answer and Counterclaim on two
22  grounds: (1) to clarify that the alleged coverage obligations in this matter arise out of WFI's
23  activities, rather than those of Kratos; and (2) to clarify that National Union denies that it
24  owed any coverage obligations to Muratore.

25       Pursuant to a previous order of this Court, National Union's deadline to amend
26  expired on February 15, 2011.  (Doc. 35.)  Rule 16(b)(4), Fed. R. Civ. P., provides that the
27  Court's scheduling order may only be modified upon a showing of good cause and with the
28  judge's consent.    National Union  has  failed  to  show  good  cause  for  the  proposed

amendments. First, clarification of the distinction between WFI and Kratos is not necessary; as the Court has stated in footnote 1, there is sufficient undisputed evidence before the Court on this issue.  Second, regardless of whether the Amended Answer is construed as admitting coverage for Muratore under National Union's policies, for the reasons stated in this Order, the Court concludes that such coverage existed. The Court will deny Defendants' Motion for Leave to File a Second Amended Answer and Counterclaim as well as St. Paul's related Motion for Leave to File Sur-Reply.

**Conclusion**

THEREFORE, IT IS ORDERED THAT:

1.      St. Paul's Motion for Summary Judgment (Doc. 113) is GRANTED;

2.      National Union's Motion for Summary Judgment (Doc. 84) is DENIED;

3.      National Union's Motion for Modification of the Scheduling Order and for Leave to File a Second Amended Answer and Counterclaim filed by National Union (Doc. 69) is DENIED;

4.      St. Paul's Motion for Leave to File Sur-Reply (Doc. 88) is DENIED;

5.      Defendants American Home and ISP are DISMISSED from this action;

6.      The Court grants declaratory relief as follows:

      a.      National Union was obligated to indemnify Burgundy and Muratore in the *Peralta* litigation and is therefore obligated to reimburse St. Paul the $2 million paid toward settlement of that litigation;

      b.      National Union had a duty to defend Kratos in the *Peralta* litigation and is therefore obligated to reimburse St. Paul 50% of the costs incurred by St. Paul in defending Kratos' claims;

//
//
//
//
//

7.    St. Paul is entitled to an award of attorneys' fees, costs and prejudment interest incurred in this litigation.  St. Paul shall file a memorandum in support of their claim for attorneys' fees pursuant to LR54.2(b)(2) within 60 days of the date this Order is filed.

DATED this 28th day of September, 2012.

_____
Jennifer G. Zipps
United States District Judge